UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| RICHARD J. WEISBERG,<br>   *Plaintiff*,<br><br>v.<br><br>JANET YELLEN, in her capacity as<br>U.S. Sec'y of the Treasury,<br>   *Defendant*. | 3:23-CV-549 (OAW) |

### ORDER GRANTING MOTION TO DISMISS

**THIS ACTION** is before the court upon Secretary Yellen's Motion to Dismiss ("Motion").  *See* ECF No. 21.  The court has reviewed the Motion, Plaintiff's opposition thereto, ECF No. 22, the Secretary's reply in support of the Motion, ECF No. 23, all supplemental notices, ECF Nos. 24–25, and the record in this case and is thoroughly advised in the premises.  For the reasons discussed herein, the Motion is **GRANTED.**

**I.  BACKGROUND**

The Fourteenth Amendment is well known and oft-cited for its equal protection and due process provisions, each of which authoritatively and regularly has been construed by the Supreme Court of the United States and by the several United States Courts of Appeals.  This case deals with a different, less recognized provision of the Fourteenth Amendment: Section Four, commonly referred to as the "Public Debt Clause."  It appears relatively rarely in modern case law and scholarship, and when it does make an appearance its discussion rarely yields firm conclusions.  Its complete text is as follows:

> The validity of the public debt of the United States, authorized
> by law, including debts incurred for payment of pensions and
> bounties for services in suppressing insurrection or rebellion,

1

> shall not be questioned. But neither the United States nor any State shall assume or pay any debt or obligation incurred in aid of insurrection or rebellion against the United States, or any claim for the loss or emancipation of any slave; but all such debts, obligations and claims shall be held illegal and void.

U.S. Const. amend. XIV, § 4.

Plaintiff asserts a claim based on the first sentence of the clause. Amidst dispute in the Capitol over the national budget, he interprets this sentence to mean that the Secretary of the Treasury is barred from allowing the country to default on its debts, even if Congress does not raise the statutory debt limit, as it is set forth in 31 U.S.C. § 3101(b). He is suing under the Declaratory Judgment Act ("DJA"), 28 U.S.C. § 2201 *et seq.*, and he asks the court (1) to declare that it is a violation of the Public Debt Clause for the Secretary of the Treasury (Secretary Yellen or any successor) to fail to satisfy any national financial obligation due to the debt ceiling, and (2) to enjoin the Secretary of the Treasury (again, Secretary Yellen and all successors) from defaulting on any national financial obligation due to the debt limit. He also seeks compensation for costs sustained in this action. Secretary Yellen has moved to dismiss Plaintiff's suit, arguing that the court is without jurisdiction to hear it.

## II. DISCUSSION

The court need not reach the jurisdictional arguments raised by the Secretary because even if subject matter jurisdiction could be established (which, for clarity, the court has not decided[1] and does not decide in this ruling), the court is restrained from

---

[1] Plaintiff argues that the court already has concluded that Plaintiff does have standing, but he misinterprets the court's order of May 8, 2023, *see* ECF No. 10, in which the court expressed reservations about the issue of standing, but still ordered the government to respond to Plaintiff's motion for a

2

hearing this action by the political question doctrine. Further, jurisdiction under the DJA is discretionary, and the court finds that the DJA is not an appropriate vehicle by which to litigate this claim. Thus, even if the political question doctrine is inapplicable, the court still would exercise its discretion under the DJA to dismiss this case in its entirety.

### A. Political Question Doctrine

"In general, the Judiciary has a responsibility to decide cases properly before it, even those it 'would gladly avoid.'" *Zivotofsky ex rel. Zivotofsky v. Clinton*, 566 U.S. 189, 194 (2012) (quoting *Cohens v. Virginia*, 5 L.Ed. 257 (1821)). But in rare instances, an exercise of jurisdiction would be inconsistent with the responsible practice of judicial "deference to the political branches." *Khulumani v. Barclay Nat. Bank Ltd.*, 504 F.3d 254, 261 (2d Cir. 2007), aff'd sub nom. *Am. Isuzu Motors, Inc. v. Ntsebeza*, 553 U.S. 1028 (2008) (quoting *Sosa v. Alvarez–Machain*, 542 U.S. 692, 733 n.21 (2004)) (internal quotation marks omitted). In those cases, the foundational principal of the separation of powers, as made practicable by the political question doctrine, "restrain[s] courts 'from inappropriate interference in the business of the other branches of [g]overnment . . . .'" *Nixon v. United States*, 506 U.S. 224, 252 (1993) (Souter, J., concurring in the judgment) (quoting *United States v. Munoz–Flores*, 495 U.S. 385, 394 (1990)).

The doctrine restricts a court from adjudicating a particular dispute not for lack of subject matter jurisdiction, but for lack of justiciability. Justiciability, unfortunately, is "not a legal concept with a fixed content or susceptible of scientific verification." *Poe v. Ullman*, 367 U.S. 497, 508 (1961). It is perhaps best described by its opposite: nonjusticiability is that element present in those cases where the judiciary has "no business entertaining the

---

preliminary injunction. That motion subsequently was withdrawn, *see* ECF No. 20, and thus the question of standing has not been adjudicated.

claim of unlawfulness . . . ." *Vieth v. Jubelirer*, 541 U.S. 267, 277 (2004). Per *Baker v. Carr*, 369 U.S. 186 (1962), a nonjusticiable political question is one which involves at least one of the following: a textually demonstrable constitutional commitment of the issue to a different branch of government; a lack of judicially discoverable and manageable standards for resolving it; the impossibility of a decision without an initial policy determination of a kind clearly calling for nonjudicial discretion; the impossibility of resolving the issue without expressing a lack of respect for the coordinate branches of government; an unusual need for unquestioning adherence to a political decision already made; or the potential for embarrassment stemming from numerous pronouncements by various departments of government on one question. This list "probably" illustrates the tests in "descending order of both importance and certainty." *Vieth*, 541 U.S. at 278. Notably, these factors do not authorize a court to avoid adjudicating political *cases*, that is to say, it does not allow a court to abdicate its constitutional duties simply because an issue is politically charged. *Baker*, 369 U.S. 186, 217 (1962) ("The doctrine of which we treat is one of 'political questions,' not one of 'political cases.'").

It is clear that the Plaintiff's claim runs afoul of several of the *Baker* tests, including the most important: a clear commitment of the issue to another branch of government. It cannot be disputed that construction of any constitutional provision, including the Public Debt Clause, is uniquely the provenance of the federal courts. *See Powell v. McCormack*, 395 U.S. 486, 521 (1969) (stating that constitutional interpretation "is a responsibility of this Court as ultimate interpreter of the Constitution.") (quoting *Baker*, 369 U.S. at 211) (internal quotation marks omitted). But as Plaintiff himself points out, the debt limit statute reflects the maximum amount that the federal government may borrow in order to meet

4

its financial obligations, and the Constitution expressly reserves the power to borrow money to the legislative branch. U.S. Const. art. I, § 8, cl. 2 ("The Congress shall have Power . . . [t]o borrow [m]oney on the credit of the United States . . . ."). Moreover, the reason the debt limit debate has arisen so regularly in Congress in recent years is because it must be discussed in relation to appropriations and the national budget, which issues the Constitution also explicitly and exclusively entrusts to Congress. U.S. Const. art. I, § 9, cl. 7 ("No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law . . . ."). Thus, the issue presented, at bottom, is one of budgetary policy. To entertain this claim would be to insert the judicial branch into a political issue that the Constitution expressly authorizes and requires the *legislative* branch to address.

With respect to the second test, "the concept of a textual commitment to a coordinate political department is not completely separate from the concept of a lack of judicially discoverable and manageable standards for resolving it; the lack of judicially manageable standards may strengthen the conclusion that there is a textually demonstrable commitment to a coordinate branch." *Nixon,* 508 U.S. at 228–29. In *Nixon* the Court noted that "[a]s a rule the Constitution speaks in general terms, leaving Congress to deal with subsidiary matters of detail as the public interests and changing conditions may require. . . ." *Id.* at 230 (quoting *Dillon v. Gloss*, 256 U.S. 368, 376 (1921)). Thus, there are occasions where the ambiguity of a constitutional term is itself proof that the term is not for the judiciary to construe. *See id.* at 230 (finding that "the use of the word 'try' in the first sentence of the Impeachment Trial Clause lacks sufficient precision to afford any judicially manageable standard of review of the Senate's actions . . . .").

Here, there is not even acknowledgment of this possibility. Plaintiff assumes, without any supporting argument, that to "question" the "validity" of the public debt means to fail to make timely payments to the country's creditors. But review of case law and scholarly literature on this question reveals that construction of the clause (and even its applicability to any debts save those incurred during the Civil War) is far from settled. *See, e.g., Great Lakes Higher Educ. Corp. v. Cavazos*, 911 F.2d 10, 17 (7th Cir. 1990) ("This little used provision of the Fourteenth Amendment was intended to prevent the 'questioning' of the war debt incurred by the Union in fighting the Civil War by any future Congress controlled by southerners and their sympathizers. This section is only brought into play when some state or federal government agency questions a debt."); *State of Del. v. Cavazos*, 723 F. Supp. 234, 245 (D. Del. 1989), aff'd, 919 F.2d 137 (3d Cir. 1990) (stating that the scope of the Public Debt Clause is "not so broad as to encompass within its coverage every debt of the United States" but rather is "specifically directed to bond debts created during the Civil War," and thus only is applicable to public bonds); Kelleigh Irwin Fagan, *The Best Choice Out of Poor Options: What the Government Should Do (or Not Do) If Congress Fails to Raise the Debt Ceiling*, 46 Ind. L. Rev. 205, 209–10 (2013) (noting that "[t]he meaning of 'public debt' under the Constitution is subject to debate" and may or may not match the meaning of the phrase as used in the debt limit statute); John McGuire, *The Public Debt Clause and the Social Security Trust Funds: Enforcement Mechanism or Historical Peculiarity?*, 7 Loy. J. Pub. Int. L 203, 214 (2006) (arguing that the Supreme Court in *Perry v. United States, 294 U.S. 330, 354 (1935),* had found that the Public Debt Clause "had a broader application that extended beyond the context of the Civil War."); Stuart McCommas, *Forgotten but Not Lost: The Original Public Meaning of Section 4 of*

*the Fourteenth Amendment*, 99 Va. L. Rev. 1291, 1300 (2013) (concluding after a historical review of the phrase "to question" that the Framers of the Constitution intended it to refer specifically to legal action, such that "the federal government is estopped from denying the validity of the federal debt as a plaintiff or defendant in court."). Absent any argument on this issue, the court declines to accept Plaintiff's proposed construction, and moreover, the court cannot determine whether the Public Debt Clause is capable of definitive construction in the first instance.[2]

With regard to the third and fourth factors, in order to address even the preliminary question of jurisdiction, the court would be required to make the initial determination of whether the debt limit likely will come into play again. And while determinations of likelihood, like construction of constitutional text, is well within the authority and ability of a federal court, in this case it would require the judicial branch to make a qualitative assessment of the executive and legislative branches that is not the court's place to make. While the court could consider the nature and frequency of previous debt ceiling activity, the question of likelihood would require a certain degree of political speculation, as well. For example, it would require the court to assess the two major parties' agendas, their appetite for collaboration and compromise, and possibly even the characterization of particular politicians' style of governance. Plaintiff's own argument is exemplary of this type of speculation. He asserts that a default is "more probable than a bipartisan, negotiated resolution" in light of the current makeup on Congress, and, more particularly, the Republican House caucus, which he describes as "radical," "combative,"

---

[2] Of course, the court could order additional briefing on this question, on which there assuredly would be significant interest from amici as well, but given that the other tests weigh heavily in favor of abstaining from presiding over Plaintiff's claims, and the court would decline to exercise jurisdiction over them in any case (as discussed below), no additional argument is needed.

uncompromising, and "focused on dismantling the government rather than legislating." ECF No. 1 at 7.  He conjectures that "whenever there is a Democratic president and the Republicans control the Senate, or the House, or both, it has become a ritual for the Republicans to refuse to raise the debt limit . . . ."  ECF No. 22 at 5.  He further contends that the most recent bipartisan agreement to suspend the debt limit (temporarily), "enraged" the "extreme faction of the House Republican caucus," members of which promised a "reckoning" for the "betrayal" of former United States Representative and Speaker of the House Kevin McCarthy, who helped broker the bipartisan deal.  ECF No. 22 at 6.  These characterizations may support Plaintiff's argument, but even more so they support the application of the political question doctrine.  His analysis clearly is not judicial or legal, but political in nature.  Indeed, for many of these characterizations, he cites news articles and editorials on such political affairs.  *See, e.g.,* ECF No. 22 at 5-6 nn. 5-16 (citing several articles and editorials, primarily from the *New York Times*).  For the court to engage in this type of analysis, it would give at least the appearance of approval or disapproval of parties and/or individual politicians.  Thus, the court concludes that this preliminary question is best left to pundits on television news shows, not the judiciary.

And finally, this determination might present an unusual need to adhere to the proclamation of another branch of government.  The nation's loan agreements are not negotiated by the judiciary, but any construction of the Public Debt Clause significantly would affect the terms of those loan agreements, and possibly even contradict them.

It is the Complaint itself, though, that convinces the court that the political question doctrine is controlling.  Most of the Complaint is devoted to describing the current political landscape in largely unflattering terms.  The Republication Party is depicted as villains

who seek to spread fallacies about the debt limit and who use the debt limit to hold the country "hostage" in order to "extort" and "coerce" concessions from Democrats in Congress. ECF No. 1 at 3–4. The Democratic party fares little better, appearing irrational and/or weak, naively negotiating across the aisle rather than unilaterally invoking the Public Debt Clause. *Id.* at 7. And while this ostensibly is an action to safeguard his social security payments, Plaintiff's pleading hardly speaks to that concern at all. Rather, it focuses on the deleterious effect Congress's current budgeting practices will have upon the national and global economy, and only once, late in the Complaint, references the personal injury he may suffer: the devaluation of his retirement savings, which appears to be merely a more particularized expression of the threat of general economic strife. After thorough review thereof, the court concludes that Plaintiff seeks an advisory opinion, which request presents "no justiciable controversy." *Gilligan v. Morgan*, 413 U.S. 1, 9 (1973) (quoting *Poe*, 367 U.S. at 508) (internal quotation marks omitted).

Thus, the court finds that dismissal under the political question doctrine is proper.

### B. Declaratory Judgment Act

Even if Plaintiff had had not run afoul of the political question doctrine in presenting the question of Section Four's construction, the court still would exercise its discretion under the DJA not to hear it.

The DJA allows a federal court to "declare the rights and other legal relations of any interested party seeking such declaration" in "a case of actual controversy within its jurisdiction." 28 U.S.C.A. § 2201(a). Its purpose is "to facilitate early and effective adjudication of disputes at a time when a controversy, though actual, may still be incipient, but before it expands into larger conflict." *Dow Jones & Co. v. Harrods, Ltd.*, 237 F. Supp.

9

2d 394, 405 (S.D.N.Y. 2002), aff'd, 346 F.3d 357 (2d Cir. 2003). Even when presented with such an action, though, a court still may decline to exercise jurisdiction over it. *See Pub. Serv. Comm'n of Utah v. Wycoff Co.*, 344 U.S. 237, 241, (1952) (stating that the DJA is an "enabling Act, which confers a discretion on the courts rather than an absolute right upon the litigant."). "Since its inception, the [DJA] has been understood to confer on federal courts unique and substantial discretion in deciding whether to declare the rights of litigants." *Wilton v. Seven Falls Co.*, 515 U.S. 277, 286 (1995).

The Supreme Court of the United States has indicated that a court should consider all "equitable, prudential, and policy arguments" when deciding whether to use its discretion to dismiss a DJA action. *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 136 (2007). Such arguments may include whether the judgment will serve a useful purpose in clarifying or settling legal issues; whether a judgment would finalize a controversy and provide relief from uncertainty; whether the DJA is being used merely for "procedural fencing" or a "race to res judicata"; whether issuance of a declaratory judgment improperly would impinge or encroach upon sovereign legal systems, or state or foreign courts; and whether there is a better or more effective remedy available. *Dow Jones & Co., Inc., v. Harrods Ltd.*, 346 F.3d 357, 359–60 (2d Cir. 2003). Courts also may consider whether an exercise of jurisdiction would be judicially efficient and economical. *Admiral Ins. Co. v. Niagara Transformer Corp.*, 57 F.4th 85, 100 (2d Cir. 2023).

The court finds that the issue presented in this action clearly is not one appropriately remedied through declaratory relief. First, embedded within Plaintiff's requested declaration is a preliminary legal issue which itself might require a declaration. Plaintiff is clear that he is not challenging the constitutionality of the debt limit statute itself,

10

*see* ECF No. 22 at 7 (stating that his is not a case regarding the debt limit statute), but "a prospective violation of his constitutional rights under" the Public Debt Clause, ECF No. 1 at 1.  However, his constitutional rights under the Public Debt Clause remain unclear.  He appears to assume that he has rights as a creditor to the federal government insofar as he is entitled to social security and retirement benefits, which he assumes to be a debt.  But it is far from clear to the court that a welfare recipient, for example, whose entitlement is noncontractual, can claim the position of a creditor.  *See Flemming v. Nestor*, 363 U.S. 603, 610 (1960) ("It is apparent that the noncontractual interest of an employee covered by the [Social Security] Act cannot be soundly analogized to that of the holder of an annuity, whose right to benefits is bottomed on his contractual premium payments."); *Weinberger v. Salfi*, 422 U.S. 749, 772 (1975) (stating in the context of a constitutional challenge to a social security eligibility requirement that "a noncontractual claim to receive funds from the public treasury enjoys no constitutionally protected status though of course Congress may not invidiously discriminate among such claimants. . . .") (internal citation omitted).  Plaintiff does not cite any authority for his proposition that he is a creditor, and his prayer for relief does not seek vindication of this proposition.  Moreover, the relief that Plaintiff requests is overbroad relative to any position he may have as a creditor.  He purports to sue to safeguard his benefits payments, but he does not ask the court to enjoin the Secretary from failing to make those payments specifically.  Rather, he asks the court to declare that the Secretary must pay *all* debts to *all* creditors.  This is not a case of an individual seeking clarification of his own rights, but of an individual seeking to render his own constitutional interpretation the controlling one.  But the DJA "does not permit litigants

to invoke the power of [federal courts] to obtain constitutional rulings in advance of necessity." *Poe*, 367 U.S. at 506 (1961).

Even assuming, though, that Plaintiff were to amend the Complaint and to plausibly allege that he is a creditor, and also that such position entitles him to bring suit under the Public Debt Clause, Plaintiff's claim still would not be appropriate for adjudication under the DJA.  There is no legal relationship alleged between Plaintiff and the Secretary of the Treasury, nor does it appear that the Secretary has asserted any adverse interest in Plaintiff's benefits payments.  Indeed, Plaintiff's recount of the relevant facts indicates that Secretary Yellen consistently has employed all available measures to continue delivering his benefits payments, and she even has asked Congress to take measures to ensure that she may do the same in the future.  *See* ECF No. 1 at 4–5, (stating that Secretary Yellen committed to taking "extraordinary measures" to avoid a default, and that she supported abolishing the federal debt limit entirely).  It is unclear to the court that the parties' differing opinions on the applicability of the Public Debt Clause qualifies as an "adverse legal interest" sufficient to warrant an exercise of jurisdiction under the DJA. *See Maryland Cas. Co. v. Pac. Coal & Oil Co.*, 312 U.S. 270, 273 (1941) (stating that an exercise of jurisdiction under the DJA is appropriate where "the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests . . . .").

Moreover, hearing this case would be antithetical to the principles of efficiency and economy.  There are many apt uses for the DJA: to present an issue "that otherwise might need to await a coercive action" brought by a party claiming injury; "to avoid accrual of avoidable damages to one not certain of his rights and to afford him an early adjudication

without waiting until his adversary should see fit to begin suit, after damage has accrued'"; to adjudicate "an actual controversy that has not reached the stage at which either party may seek a coercive remedy, or in which the party entitled to such a remedy fails to sue for it"; and to allow "a party who is challenged, threatened or endangered in the enjoyment of what he claims to be his rights, to initiate the proceedings against his tormentor and remove the cloud by an authoritative determination of the plaintiff's legal right, privilege and immunity and the defendant's absence of right, and disability." *United States v. Doherty*, 786 F.2d 491, 498–99 (2d Cir. 1986) (collecting appellate cases) (internal citations and quotation marks omitted). Thus, the DJA is best applied in those cases where a party seeks court intervention to stave off liability, so as not to be forced to make a judgment call as to the legality of a certain course of action that may render them vulnerable to liability.

This is not remotely such a case. Plaintiff is not faced with a situation in which he must expose himself to liability absent an adjudication of his asserted right. There is no course of action Plaintiff wishes to undertake the legality of which is ambiguous. There is no danger that Plaintiff might be sued by the Secretary, or anyone else, absent an adjudication of his rights with respect to his retirement benefits. Plaintiff's claim therefore "does not fit comfortably within [the DJA's] purpose or within the language of § 3184." *Id.*

For the reasons discussed herein, the court declines to exercise jurisdiction over Plaintiff's DJA claim.

## III. CONCLUSION

Accordingly, it is thereupon **ORDERED AND ADJUDGED** that the Motion to Dismiss, ECF No. 21, is **GRANTED.**  The action is dismissed, and the Clerk of Court is asked, respectfully, to please close this case.

**IT IS SO ORDERED** in Hartford, Connecticut, this 7th day of August, 2024.

_____/s/_____<br>
OMAR A. WILLIAMS<br>
UNITED STATES DISTRICT JUDGE